**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SEHIN DEGEFU,

        Plaintiff,

        v.

DEPARTMENT OF VETERANS AFFAIRS,
*et al.*,

        Defendants.

Civil Action No. 20-cv-3548 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff Sehin Degefu began working as a pharmacist with the United States Department of Veterans Affairs in 2008, where she alleges that, following her diagnosis of Raynaud's Disease the following year, she was subject to a years-long series of discriminatory actions at her workplace. After pursuing two complaints before the U.S. Equal Employment Opportunity Commission (EEOC), which were dismissed by an Administrative Law Judge on April 9, 2019, she filed the instant complaint before this Court alleging discrimination, failure to accommodate, hostile work environment, and retaliation, all on the basis of her disability and requests for reasonable accommodation. *See generally* Compl., ECF No. 1. Pending before this Court is defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 19. For the reasons set forth below, this motion is denied.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below.

A.      **Factual Background**

Plaintiff began working as a pharmacist at the VA Medical Center's Pharmacy Service Unit in the Outpatient Section in Washington, D.C., on January 22, 2008.  Compl. ¶ 10; Defs.' Mot., Defs.' Statement of Material Facts ("Defs.' SMF") ¶ 1, ECF No. 19-10.  At some point in 2009, she was diagnosed with Raynaud's Disease, a disorder in which blood vessels— particularly in the extremities—narrow in response to cold or stress, resulting in a temporary loss of blood flow to the surface of the skin.  Compl. ¶ 12.  Plaintiff sought three reasonable accommodations at her workplace in the wake of her diagnosis.  The first was permission to park inside a parking garage, allowing her to minimize potential exposure to harsh weather.  Defs.' Mot., Ex. 4, EEOC Decision No. 570-2014-00569X (April 9, 2019) ("EEOC Judgment") at 6, ECF No. 19-4.  This accommodation appears to have been granted without issue.  In 2012, however, plaintiff requested another reasonable work accommodation for her disability—which plaintiff alleges set off a cascade of discriminatory actions against her, beginning with the discriminatory animus of her direct supervisor, Tamiru Adisu.

1.      *Plaintiff's Interactions with Adisu and Resulting Transfer*

In February 2012, plaintiff informally requested permission from her supervisors to use a space heater at her work station—a request that was accommodated immediately while she sought an official reasonable accommodation.  EEOC Judgment at 6.  The following month, she officially requested the reasonable accommodation, which was granted.  Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pls.' Opp'n") at 6, ECF No. 22.

According to plaintiff, soon after she made this request, Adisu began verbally harassing her.  She testified in the administrative hearing that she and Adisu had initially enjoyed a positive relationship, but after her request, her supervisor "became . . . a different person."  Pl.'s Opp'n, Ex. 1, Excerpted Testimony of Sehin Degefu at EEOC Hr'g on Merits (Aug. 7, 2017) ("Pl.'s

Excerpted Hr'g Tr. (Degefu)") at 7, ECF No. 22-2.  She provided evidence of at least six different incidents spanning from April to September 2012 in which Adisu "verbally abused Plaintiff . . . in the presence of patients," "sabotaged her work efforts," "accused [plaintiff] of throwing work on [a] desk," and accused plaintiff of "insubordination," "disrespect," "being AWOL," and making mistakes at work.  Compl. ¶¶ 18, 22–25, 27–28.  Plaintiff has described a series of unprovoked interactions with Adisu in which he yelled at plaintiff, criticizing her "attitude" and "body language," often in front of colleagues and patients.  Pl.'s Excerpted Hr'g Tr. (Degefu) at 8.  In September, plaintiff alleges that Adisu's harassment escalated, with the supervisor sending multiple emails each day inquiring about her whereabouts and copying her second-line supervisor Linwood Moore and third-line supervisor Terrill Washington.  Those emails asked questions such as when plaintiff went to the bathroom, for how long, and when she returned.  *Id.* at 17.  At this point, she "became sick" because her workplace had become so upsetting; she testified that she "was in Mr. Moore's office almost on a daily basis . . . crying." *Id.*

During this period, plaintiff lodged with Moore multiple complaints against Adisu, and in turn, Adisu and other unspecified co-workers lodged complaints with Moore against plaintiff. EEOC Judgment at 6; Pl.'s Resp. SMF ¶ 15, ECF No. 22-1.  In November 2012, plaintiff received a performance review, written by Adisu, stating that her "refusal to speak to many of her coworkers and her immediate supervisor concerning patient care matters has severely damaged her ability to effectively communicate," and ranking her "excellent," rather than "outstanding."  Compl. ¶ 29; EEOC Judgment at 6.  Previously, plaintiff had received only "outstanding" appraisals.  Compl. ¶¶ 11, 29.

Although plaintiff did not seek a transfer from her position in the Outpatient Section, on September 3, 2012, she was informed that she was reassigned to the Primary Care Clinic, which occurred in October of that year.  Compl. ¶ 26; EEOC Judgment at 6; Defs.' SMF ¶¶ 13–14. Plaintiff vehemently opposed the transfer, arguing with Moore and Washington that she felt it was unfair for her to be forced to leave her years-long position due to her supervisor's harassment.  Pl.'s Excerpted Hr'g Tr. (Degefu) at 16–17.

Even after plaintiff's transfer, Adisu continued to seek out plaintiff.  In a January 2013 meeting with Washington and a human resources supervisor, plaintiff expressed her concern that Adisu was continuing to harass her.  Compl. ¶ 33.  Later, on July 15, 2014, Adisu entered the Primary Care Clinic, where plaintiff alleges he lingered at her doorway and "stared at her in a menacing manner."  Compl. ¶ 35; Pl.'s Excerpted Hr'g Tr. (Degefu) at 22–23.  *See also* Pl.'s Opp'n, Ex. 7, Excerpted Testimony of Connie Wheadon at EEOC Hr'g on Merits (Aug. 8, 2017) at 85 (health tech's testimony describing Adisu as "lurking in the hallway for a while," causing the health tech and another member of staff to confront him).  When plaintiff called Moore about the encounter, he reportedly replied that he did not care.  *Id.*

### 2.   *Plaintiff's Request to Avoid Night Shifts*

Around the same time that plaintiff was transferred, the Department of Veterans Affairs instituted a policy change whereby all pharmacists were promoted to the GS-12 level and required to participate in rotations that included evening and weekend shifts approximately once every nine weeks.  EEOC Judgment at 6–7.  In order to work those new shifts, the outpatient pharmacists, including plaintiff, had to be cross-trained with inpatient pharmacy skills—an extended process that resulted in plaintiff not being scheduled to work an evening shift until

September 2014.  *Id.* at 7.  *But see* Pl.'s Resp. SMF ¶ 22 (contending that not all outpatient pharmacists were cross-trained).

Beginning in August 2014, plaintiff formally requested that she not be required to work evening shifts.  Compl. ¶ 37; *see also* Pl.'s Opp'n, Ex. 18, Notice of Informal EEO Contact (Sept. 9, 2014) (noting that plaintiff contacted the Office of Resolution Management at the VA Department complaining that her requests to only work the day shift were denied), ECF No. 22-2.  The basis for this request is mired in disagreement between the parties.  First, the parties contest plaintiff's originally stated bases for the accommodation request, but at least one of her proffered reasons was that the night shift could aggravate her disability.  Defs.' SMF ¶¶ 19; EEOC Judgment at 6 (noting that plaintiff's initial objection was that she was only hired to work day shifts, only later contending her disability was the reason); Pl.'s Resp. SMF ¶¶ 19, 23 (framing the request only in terms of her disability).  Second, the parties spar over whether the night shift would have subjected plaintiff to cold temperatures: defendants urge that plaintiff was told by management that she could conduct the shift from rooms kept at normal temperatures, without venturing into the colder IV room; plaintiff argues that the evening shifts maintained only two pharmacists at a time, so that if the other pharmacist was ever unavailable, she would be required to supervise the technician in the colder IV room.  Defs.' SMF ¶¶ 24–26; Pl.'s Resp. SMF ¶ 23.  In any case, intervening events that Fall mooted the issue.

On September 24, 2014, plaintiff attempted suicide in the parking lot of her workplace, and she was subsequently hospitalized and diagnosed with depression.  Compl. ¶ 42; Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 13, ECF No. 19.  Her physician submitted repeated documentation to defendants requesting that plaintiff be allowed to work only the day shift as a result of her depression diagnosis, rather than due to her Raynaud's Disease.  Pl.'s

Opp'n, Ex. 21, Ltr. from Dr. Adam Lowy (Jan. 2, 2015), ECF No. 22-2; *id.,* Ex. 22, Ltr. from Dr. Adam Lowy (Jan. 27, 2015), ECF No. 22-2.  *id.,* Ex. 23, Ltr. from Dr. Adam Lowy (Feb. 11, 2015), ECF No. 22-2; *id.,* Ex. 24, Ltr. from Dr. Adam Lowy (June 4, 2015), ECF No. 22-2. Defendants approved this request on April 14, 2015.  *See* Pl.'s Opp'n at 13.  While this request was pending, plaintiff was scheduled to work an evening shift in January 2015; on the advice of her doctor, she did not attend the shift and was "AWOL'd."  Pl.'s Excerpted Hr'g Tr. (Degefu) at 38.  In the end, plaintiff apparently never worked a night shift.[1]

### 3.      *EEOC Proceedings*

Plaintiff initiated her first administrative complaint on November 29, 2012, which she filed formally on March 4, 2013.  Compl. ¶ 31; Defs.' Mot., Ex. 6, Complaint of Employment Discrimination (March 4, 2013), ECF No. 19-6.  In the EEOC complaint, she alleged reprisal, noting her "performance appraisal evaluation" and "harassment (hostile work environment)" over the course of 2012.  *See* Complaint of Employment Discrimination (March 4, 2013).  The Department of Veterans Affairs' Office of Resolution Management issued a notice of partial acceptance of her complaint on April 25, 2013, restating her claim as the following: "Whether complainant was subject to a hostile work environment from April 30, 2012 through November 17, 2012, based on reprisal (contact with facility EEO Program Manager) as evidenced by" six incidents with Adisu, her transfer to the Primary Care Clinic, and the "negative narrative" in her November 2012 performance evaluation.  Defs.' Mot., Ex. 7, Notice of Partial Acceptance of EEO Complaint (April 25, 2013), ECF No. 19-7.  Her claim related to the transfer was dismissed

---

[1]      This is the conclusion of the Administrative Law Judge, who issued on April 9, 2019, the finding of fact that plaintiff never worked "a single evening shift; not even the one she was initially scheduled for."  EEOC Judgment at 8.  Defendants reassert this conclusion in their Statement of Material Facts, *see* Defs.' SMF ¶ 27—a statement that plaintiff deemed "[f]alse" because "[p]laintiff was repeatedly scheduled on the night shift and was told she would have to work in the cold IV room."  Pl.'s Resp. SMF ¶ 27.  Plaintiff does not affirmatively allege— let alone provide evidence—that she actually worked the night shift anywhere in the record before this Court.

for failing to initiate contact with an EEO Counselor within 45 days of the incident alleged, but all alleged events were accepted for investigation of plaintiff's hostile work environment claim. *Id.*

Plaintiff initiated her second complaint on September 5, 2014, and filed a formal complaint of discrimination on October 15, 2014. *See* Defs.' Mot., Ex. 3, Complaint of Employment Discrimination (Oct. 15, 2014), ECF No. 19-3; *id.,* Ex. 8, Notice of Partial Acceptance of EEO Complaint (Dec. 31, 2014), ECF No. 19-8. In this second complaint, plaintiff alleged bases of "disability" and "reprisal," pointing to the denial of her request for reasonable accommodation to work only the day shift that she emphasized she was hired to perform. Complaint of Employment Discrimination (Oct. 15, 2014). The Department of Veterans Affairs' Office of Resolution Management issued a notice of partial acceptance of her complaint on December 31, 2014, restating her claim as the following: "Whether complainant was subjected to a hostile work environment based on disability, age, and in retaliation for prior EEO activity as evidenced by" plaintiff's assignment to work evening shifts and denial of her request for reasonable accommodation to work only day shifts. Notice of Partial Acceptance of EEO Complaint (Dec. 31, 2014) (dismissing claims related to transfer to Primary Care Clinic and her treatment during 2012, which were already under consideration). Plaintiff also claimed, as part of this complaint, that she suffered from a hostile work environment when she saw Adisu in the Primary Care Clinic in July 2014, and Moore took no action in response.

After a multi-day hearing, an Administrative Law Judge ("ALJ") issued a decision on April 9, 2019, concluding that plaintiff was "not [] subjected to a hostile work environment based on reprisal for her March 9, 2012 contact with facility EEO Program Manager; requesting a reasonable accommodation; or for filing" the 2013 complaint, nor "subjected to a hostile work

environment based on reprisal and/or disability (mental and physical)." EEOC Judgment at 3.

As to the first complaint, regarding the events of 2012, the ALJ held that plaintiff "utterly

fail[ed] to establish a nexus between the protected activity and the alleged adverse treatment."

EEOC Judgment at 9.  Even if plaintiff had made a prima facie case, however, the ALJ held that

defendants acted on the basis of legitimate, nondiscriminatory reasons, noting that plaintiff "had

strained relationships with at least six different pharmacy employees" when she was transferred

to the Primary Care Clinic—reflecting "incongruent personalities and common workplace

grievances" rather than discrimination.  *Id.* at 10.

As to plaintiff's second complaint, the ALJ held that plaintiff again failed to establish a

nexus between her disability and the alleged adverse action.  Management "more than

accommodated her–both formally and informally" by granting the reasonable accommodation

that she would not have to enter the colder IV room during evening shifts, even if her request to

be entirely removed from the evening shift was not granted.  *Id.* at 13.  The ALJ also emphasized

that plaintiff's encounter with Adisu in the Clinic in July 2014 was "the one and only time

Complainant saw Mr. Adisu on her floor," and Adisu did not attempt to approach or speak to

plaintiff.  *Id.* at 13.  As to this interaction, then, plaintiff failed to demonstrate either a nexus

between her disability and Adisu's alleged conduct, or that the conduct was so severe as to rise to

the level of creating a hostile work environment.  *Id.*

## B.   Procedural Background

Approximately twenty months after the issuance of the ALJ's EEOC decision, plaintiff

initiated this lawsuit, bringing claims for unlawful discrimination, failure to accommodate,

hostile work environment, and retaliation in violation of the Rehabilitation Act of 1973

("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*  Compl. at 1–11.  The complaint alleges four

counts against defendants: first, that defendants discriminated against her on the basis of her

disability; second, that she was subject to a pattern of retaliatory harassment after requesting reasonable accommodation, constituting a hostile work environment; third, that defendants failed to provide a reasonable accommodation for her disability; and fourth, that defendants retaliated against her after she initiated an informal employment complaint.  Compl. ¶¶ 51–61.

After the parties completed discovery in October 2021, they filed a Joint Status Report asking to be referred to mediation, *see* Joint Status Report, ECF No. 13, which request was granted,  Min. Order (Oct. 26, 2021), but was unsuccessful, *see* Parties' Joint Motion for Proposed Scheduling Order, ECF No. 17.  Thereafter, defendants filed the pending motion for summary judgment, which plaintiff opposes.  Pl.'s Opp'n, ECF No. 22.  The motion is now ripe.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150–51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp*., 801 F.3d 290, 295–96 (D.C. Cir. 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England,* 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).  Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*  The Court

10

is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

"In recognition of the difficulty of uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with 'special caution.'" *Nagi v. Buttigieg*, Case No. 16-cv-2152 (FYP), 2022 WL 2904261, at *4, (D.D.C. July 22, 2022) (quoting *Aka v. Wash. Hosp. Ctr.,* 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  At the same time, courts need not accept as true claims made by a non-movant that "rest[] entirely upon a conclusory representation," because "accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III.    DISCUSSION

Defendants argue that they are entitled to summary judgment on all four of plaintiff's claims, contending, first, that plaintiff trips at the threshold by failing to navigate the technical demands of the exhaustion doctrine as to Counts One, Three and Four, because plaintiff's administrative complaints, as accepted, were framed only in terms of hostile work environment claims.  Defs.' Mem. at 18.  This argument is addressed first.

On the merits, both parties' briefings reflect an imprecise hodgepodge of arguments resting on incomplete factual narratives, but as the non-moving party bearing the ultimate burden of proof at trial, plaintiff has sufficiently "designated specific facts showing that there is a genuine issue for trial" to discharge her current burden of production as to the claims alleged. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex*, 477 U.S. at 324).  Defendants

fail to address plaintiff's discrimination claim (Count One), arguing first that plaintiff was provided the reasonable accommodation she requested—*contra* plaintiff's Count Three—of not being required to work in the IV room during evening shifts.  Defs.' Mem. at 22.  In response, plaintiff argues that she was "never g[iven] the option of avoiding the IV room," and notes that her requests to be taken off the evening shift based on her depression diagnosis were also not handled in a timely manner.  Pl.'s Opp'n at 18.  As to Count Two, the hostile work environment claim, defendants argue that plaintiff's allegations do not comprise a sufficiently severe environment, nor did plaintiff demonstrate a nexus between the hostile behavior and her disability.  Defs.' Mem. at 25–29.  Plaintiff retorts that the merit of this claim necessarily rests on the testimony of witnesses—including plaintiff, her supervisors, and her co-workers—and is ill-suited to resolution at summary judgment.  Pl.'s Opp'n at 25.  Finally, as to plaintiff's retaliation claim in Count Three, defendants contend that plaintiff has not demonstrated that she "suffered an adverse employment action," or that "there was a causal connection between the protected activity and the adverse employment action"—two required elements of the claim.  Defs.' Mem. at 23.  Each of these arguments are addressed in turn.

### A.      Exhaustion of Administrative Remedies

A plaintiff may file a Rehabilitation Act action in federal court only after exhausting her administrative remedies before the relevant federal agency for each allegedly discriminatory act. *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).  Under the Rehabilitation Act, a failure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  *See id.*  Since exhaustion of Rehabilitation Act claims "is a jurisdictional requirement," the plaintiff has the burden to plead and prove it.  *Carty v. District of Columbia*, 699 F. Supp. 2d 1, 2 n.2 (D.D.C. 2010) (citation omitted).

The procedures governing administrative processing of discrimination complaints brought by employees of the federal government under the Age Discrimination in Employment Act (ADEA), Title VII, and the Rehabilitation Act are set forth in 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  *See* 29 C.F.R. § 1614.105.  An employee "must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."  *Id.* § 1614.105(a).  "An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ."  *Id.* § 1614.105(a)(1).

If the matter is not resolved through informal counseling, the aggrieved employee must, within 15 days, file a written complaint with the agency that allegedly discriminated against him or her.  *See id.* §§ 1614.106(a)–(b).  The agency must investigate the matter within 180 days unless the parties agree in writing to extend the investigation period or the agency rejects the complaint and issues a final dismissal.  *See id.* §§ 1614.106(e)(2), 1614.107.  At the conclusion of the agency's investigation, the complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency.  *See id.* § 1614.108(f).

A complainant who receives an adverse final decision from the agency may appeal that decision to the EEOC within 30 days, or may file a civil action within 90 days.  See 42 U.S.C. § 2000e–16(c); 29 C.F.R. §§ 1614.402(a), 1614.407; *see also Wilson v. Pena*, 79 F.3d 154, 157 (D.C. Cir. 1996); *Holley v. Dep't of Veterans Affairs*, 165 F.3d 244, 245–46 (3d Cir. 1999).  A complainant also may file a civil action at any time after a complaint has been pending before the agency or the EEOC for at least 180 days.  *See* 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.407.

"Complainants must timely exhaust these administrative remedies before bringing their claims to court."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  As the U.S. Supreme Court stated in *National Railroad Passenger Corp. v. Morgan*, "strict adherence to the

procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."  536 U.S. 101, 108 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).  At the same time, "[t]he primary purpose of the exhaustion requirement is to provide the EEOC and defendants with sufficient notice to begin the investigative process," *Brokenborough v. District of Columbia*, 236 F. Supp. 3d 41, 50 (D.D.C. 2017), and the requirement "should not be construed to place a heavy technical burden on individuals untrained in negotiating procedural labyrinths," *id.* (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)).  The lawsuit following the EEOC charge is "limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park,* 71 F.3d at 907 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). Specifically, for "a charge to be regarded as 'reasonably related' to a filed charge . . . it must at a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Haynes v. District of Columbia Water & Sewer Auth.*, 924 F.3d 519, 526–27 (D.C. Cir. 2019) (quoting *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010)).

Defendants' attempt to bar plaintiff's lawsuit on procedural grounds fails.  Plaintiff's complaint rests on the same series of events investigated in the administrative process: the alleged months of harassment in the wake of plaintiff's request for reasonable accommodation in March 2012, her transfer to the Primary Care Clinic, and the initial denial of her request to avoid evening shifts in September 2014.  Indeed, although the administrative proceedings framed both complaints as "based on a theory of hostile work environment," Defs.' Reply at 7, the Department of Veterans Affairs was on notice of plaintiff's other claims arising from the same course of conduct.  In the Notice of Partial Acceptance of her 2013 complaint, the Department of Veterans Affairs described plaintiff's hostile work environment claim arising from her

encounters with Adisu as "based on reprisal," Notice of Partial Acceptance of EEO Complaint

(April 25, 2013), ECF No. 19-7, registering that plaintiff believed she had suffered retaliation—

alleged in plaintiff's complaint before this Court as Count Four—as a result of her efforts to

obtain a reasonable accommodation to use a heater at work.  Additionally, in the Notice of

Partial Acceptance of her 2014 complaint, the Department of Veterans Affairs described plaintiff

as "claim[ing] discrimination based on disability and retaliation for prior EEO activity" based on

the denial of her request for reasonable accommodation to work only the day shift, and further

noted that, in an attachment, plaintiff "stated she believed she continued to be subjected to a

hostile work environment" on the basis of her disability.  Notice of Partial Acceptance of EEO

Complaint (Dec. 31, 2014), ECF No. 19-8.  Plaintiff's 2014 administrative complaint, then,

alleged all claims ultimately brought as Counts One through Four.

Notwithstanding the administrative record documentation of plaintiff's assertion of the

same claims brought to this Court, defendants argue that plaintiff failed to challenge the

Department of Veterans Affairs' hostile work environment-focused formulation of her claims,

relying on several cases that are inapposite.  *See* Defs.' Reply at 7–8.  For example, in *Dick v.*

*Holder*, the Court held that an FBI agent failed to exhaust administrative remedies when he

failed to object to the scope of the EEO investigation that omitted his later claims of disability

discrimination, when his initial administrative complaint had only claimed discrimination based

on age and reprisal, and as a result, his inaction when the investigation similarly excluded

disability discrimination from its scope precluded a finding that the administrative complaint

"'could reasonably be expected upon investigation to lead to' his Rehabilitation Act discrete-act

and hostile work environment claims."  80 F. Supp. 3d 103, 112–14 (D.D.C. 2015) (quoting

*Park*, 71 F.3d at 909); *see also Cheatham v. Holder*, 935 F. Supp. 2d 225, 235–36 (D.D.C. 2013)

(holding plaintiff failed to exhaust claims he was not selected for two paralegal positions, when he had only raised his non-selection for two different positions with his EEO counselor and did not object when the EEO investigation did not include those two positions); *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 68 (D.D.C. 2011) (holding plaintiff abandoned religious and gender discrimination and retaliation claims when EEO's acceptance of complaint identified only age discrimination claim).  In these cases, the notices of acceptance of the administrative complaints undeniably excluded the claims later raised in civil litigation by the complainants, giving the federal agencies no "opportunity to handle matters internally whenever possible." *Brown v. Marsh*, 777 F.2d 8, 14 (D. C. Cir.1985).  Here, by contrast, the Notices explicitly addressed all four of the claims currently pending, as well as the same underlying factual precursors, even if the Notices primarily framed the allegations as related to a hostile work environment claim.  The allegations in plaintiff's complaint are sufficiently "like or reasonably related to the allegations of the charge[s]" in her administrative complaints that plaintiff has satisfied the exhaustion requirement.  *Haynes*, 924 F.3d at 526 (quoting *Park*, 71 F.3d at 907).

### B.    Hostile Work Environment Claim

Plaintiff's claim in Count Two of a hostile work environment largely rests on her interactions with Adisu over the course of 2012, culminating in the negative narrative in her performance review and her transfer to the Primary Care Clinic.  Defendants contend that these allegations are legally insufficient to meet the requirements of a hostile work environment claim, which requires that "a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (Kavanaugh, J.) (quoting *Harris v. Forklift Sys. Inc.*, 510

U.S. 17, 21 (1993).[2]  Plaintiff has sufficiently demonstrated that a reasonable jury could conclude that she labored under such conditions.

The determination of whether a workplace is abusive enough to constitute a hostile work environment is "not, and by its nature cannot be, a mathematically precise test." *Harris,* 510 U.S. at 22.  Courts must examine all of the circumstances of the claims, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance," and "[t]he effect on the employee's psychological well-being." *Id.* at 23. Allegations of "isolated expression[s] of frustration" do not generally "rise to the level of severity indicating hostility or abuse." *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014).

The record before this Court suffices to meet the standard that a reasonable juror could find that plaintiff suffered pervasive abuse that goes beyond "ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). Plaintiff has provided evidence that, in the wake of her request for an accommodation, Adisu "became . . . a different person" and began subjecting her to increasingly abusive treatment. Pl.'s Excerpted Hr'g Tr. (Degefu) at 7.  The abusive incidents occurred over a short period of time—from approximately April to September 2012—and degraded plaintiff's psychological well-being, resulting in her frequent trips to the employee health center and the aggravation of

---

[2]     Plaintiff pled all four of her claims pursuant to the Rehabilitation Act, which does not explicitly create a cause of action for a hostile work environment, but the D.C. Circuit has assumed without deciding that plaintiffs can allege hostile work environment claims under the ADEA and Rehabilitation Act.  *See Bain v. Off. of Att'y Gen.*, Case No. 21-cr-1751 (RDM), 2022 WL 17904236, at *24 (D.D.C. Dec. 23, 2022) (collecting cases); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (Kavanaugh, J.) (assuming that a plaintiff can allege a hostile work environment claim under the ADEA and Rehabilitation Act); *Carter v. Carson*, 715 F. App'x 16, 17 (D.C. Cir. 2018) (per curiam) (same).  This Court follows suit.

her anxiety.  In at least one instance, the abuse was so severe that plaintiff was excused by Moore to take the remainder of the day off.  *Id*. at 17.

Defendants contend that plaintiff's negative performance review and transfer to the Primary Care Clinic reflect her strained relationship with a number of other co-workers in the pharmacy—not just Adisu.  Defs.' Mem. at 28–29.  This explanation is supported by the performance review itself, *see* Defs.' Mot., Ex. 2, Performance Appraisal Program at 13, ECF No. 19-2, as well as plaintiff's testimony that she asked Adisu to avoid scheduling her with at least one other coworker.  Defs.' Mot., Ex. 5, Excerpted Testimony of Sehin Degefu at EEOC Hr'g on Merits (Aug. 7, 2017) ("Defs.' Excerpted Hr'g Tr. (Degefu)") at 5, ECF No. 19-5.  In his testimony in the same administrative hearing, Moore named approximately eight additional co-workers about whom he testified plaintiff complained.  *Id.* at 14.  Plaintiff, for her part, confirms her difficult relationship with co-workers but she contends that she only experienced problems with a single other employee besides Adisu.  *Id.* at 4–5.  Her perception or recollection of her own complaints to Moore may be incorrect.  Nonetheless, the parties' vastly different narratives of plaintiff's work environment—based on contradicting testimony by plaintiff and Moore—underscore the presence of genuine issues of material fact on the record.  "[T]hese are precisely the sort of credibility determinations that must be left to a jury."  *Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 155 (D.D.C. 2015); *see also Hall v. Washington Metro. Area Transit Auth.*, Case No. 19-cv-1800 (BAH), 2020 WL 5878032, at *15–16 (D.D.C. Oct 2, 2020) (denying summary judgment as to hostile work environment claim where plaintiff alleged her supervisor made frequent and disparaging remarks, resulting in a negative performance review and placement on a performance improvement plan).  Summary judgment on this count is therefore denied.

C.       **Failure-to-Accommodate Claim**

To prevail on a failure-to-accommodate claim under the Rehabilitation Act, a plaintiff must produce sufficient evidence (1) that she was disabled, (2) that her federal employer had notice of her disability, and (3) that the employer denied her request for a reasonable accommodation of her disability. *Chenari v. George Washington Univ.*, 847 F.3d 740, 746–47 (D.C. Cir. 2017). Defendants do not dispute that the first two requirements are met: plaintiff was disabled and the Department had notice of her disability. Defs.' SMF ¶¶ 4–6. Defendants contend, however, that plaintiff cannot produce sufficient evidence to meet the third element because no reasonable jury could find that the Department denied her request for a reasonable accommodation.

The parties' disagreement turns on whether the Department's response to plaintiff's request to be removed from the evening rotation was a sufficiently reasonable accommodation. Rather than being immediately removed from the rotation in September 2014, defendants allege that plaintiff was offered the accommodation that she would not have to enter the colder IV room during those shifts. Defs.' Mem.. at 22; Defs.' SMF ¶¶ 24–26. Plaintiff, by contrast, alleges that she "was told she would have to work in the cold IV room," and avoiding doing so would be impossible during an evening shift. Pl.'s Resp. SMF ¶¶ 23–27. An employer does not meet its Rehabilitation Act obligations by "agreeing to accommodate an employee in theory and then failing to do so in practice." *Welch v. Skorton*, 299 F. Supp. 3d 102, 110 (D.D.C. 2018). Consequently, whether the Department failed to reasonably accommodate plaintiff is a "matter for a jury to decide." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 128 (D.D.C. 2009) (denying motion for summary judgment where parties disagreed over the need for plaintiff to be present in the office in response to her request to telecommute). Summary judgment on this count is therefore denied.

19

### D.      Retaliation Claim

"To establish a prima facie case of retaliation based on circumstantial evidence, a plaintiff must show that (i) she engaged in statutorily protected activity; (ii) she suffered a materially adverse action by her employer; and (iii) a causal link connects the two." *Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015) (cleaned up).  The burden then shifts to defendants to proffer a "legitimate, nondiscriminatory reason for its action," *id.* (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)), which, if discharged, shifts once again to plaintiff to produce "'sufficient evidence to create a genuine dispute on the ultimate issue of retaliation' by showing either directly that 'a discriminatory reason more likely motivated the employer,' or indirectly that 'the employer's proffered explanation is unworthy of credence,'" *id.* (quoting *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014)).

Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claim because plaintiff cannot satisfy either of the final two prongs.  As to the requirement of a materially adverse action, defendants contend that none of the actions taken with respect to plaintiff—the negative narrative in plaintiff's performance review, transfer to the Primary Care Clinic, or assignment to the evening shift—constitute materially adverse actions, *see* Defs.' Reply at 11–13.  As to the causation requirement, defendants urge that plaintiff's first request for reasonable accommodation occurred in 2010, so the employment actions taking place in 2012 through 2014 reflect "too wide of a time span."  Defs.' Reply at 11.  Each element is considered in turn.[3]

---

[3]      Defendants' contention that plaintiff's Count One claim of pure discrimination lacks merit is entirely conclusory and not supported by any specific arguments in their filings.  *See* Defs.' Mem. at 18–22 (addressing only the failure to accommodate claim); *see generally* Defs.' Reply (addressing only plaintiff's other three claims).  "A defendant moving for summary judgment must still 'discharge the burden the rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.'"  *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015)

1. ***Adverse Action Requirement***

Courts apply slightly different standards to determine whether an employer took adverse action in the context of "pure discrimination claim[s]" and retaliation claims, with the latter "encompass[ing] a broader sweep of actions." *Baloch*, 550 F.3d at 1198 n.4. For a "pure discrimination claim," *id.*, the adverse employment action must occur "with respect to that employee's 'terms, conditions, or privileges of employment.'" *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (quoting 42 U.S.C. § 2000e–2(a)(1)). By contrast, to prevail on a retaliation claim, the question is not whether "the challenged actions were related to the terms or conditions of employment," *Burlington Northern & Santa Fe Ry. Co. v. White ("White")*, 548 U.S. 53, 68, 70 (2006), but rather, whether the employer's actions "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" *id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (interpreting Title VII anti-retaliation provision). *See also id.* at 70–71 (upholding jury verdict that reassignment of plaintiff from forklift duty to standard track laborer constituted adverse action in retaliation context, "judged from the perspective of a reasonable person in the plaintiff's position," where

---

(quoting *Celotex*, 477 U.S. at 328 (1986) (White, J., concurring)). Defendants have failed to discharge this light burden as to Count One.

    In any case, plaintiff has sufficiently identified evidence that a jury could credit in support of her discrimination claim. "Under . . . the Rehabilitation Act, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch*, 550 F.3d at 1196. This inquiry closely parallels the retaliation claim inquiry, with the sole exception that the D.C. Circuit has interpreted the first prong—adverse employment action—to require action "with respect to that employee's 'terms, conditions, or privileges of employment'" in the context of pure discrimination claims. *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (quoting 42 U.S.C. § 2000e–2(a)(1)). In *Chambers*, the D.C. Circuit overruled its prior holding in *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), by holding that plaintiffs need not demonstrate that the action resulted in any "objectively tangible harm"; instead, "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete." 35 F.4th at 874–75. *See also Bain*, 2022 WL 17904236, at *19 (holding that *Chambers* applies in the context of the Rehabilitation Act). Thus, for the same reasons addressed *infra*, plaintiff has sufficiently demonstrated that her transfer to the Primary Care Clinic could constitute adverse employment action in the eyes of a reasonable juror.

laborer position was "more arduous and dirtier" and forklift position was "objectively considered a better job" with more prestige).

Here, plaintiff contends that she suffered the following adverse actions beginning after she engaged in protected EEO activity: (1) "negative comments on her performance appraisal," (2) the "refus[al] to accommodate her disability," (3) the "delay[] [in] responding to her doctor's accommodation requests, (4) plaintiff's transfer to the Primary Care Clinic, and (5) her "place[ment] on the evening shift." Pl.'s Opp'n at 21. Defendants are correct that the majority of these actions do not rise to the level of materially adverse actions. First, as to the negative narrative in plaintiff's 2012 performance review, the D.C. Circuit has consistently held that a mere negative review, without tangible consequences, is insufficient to constitute an adverse action. *See Baloch*, 550 F.3d at 1199 ("performance reviews typically constitute adverse actions only when attached to financial harms"); *cf. Weber v. Battista*, 494 F.3d 179, 184–86 (D.C. Cir. 2007) (holding that, where employer awarded financial performance incentives on the basis of reviews, a negative performance review constituted an adverse action). Plaintiff does not allege any negative outcomes flowed from her performance review; instead, around the same time of this review—though the exact timing of the employment action is unclear—she was promoted from the GS-11 to GS-12 salary level as part of a pharmacy-wide policy change. *See* Defs.' SMF ¶¶ 16, 21; EEOC Judgment at 6.

Plaintiff's claims that the failure to accommodate her disability, delay in accommodating her disability, and assignment to the evening shift constitute materially adverse actions can be taken together. Since plaintiff alleges no failure or delay in accommodating her 2012 request for a heater—indeed, she has entered into the record a copy of the letter granting that request, *see* Pl.'s Opp'n, Ex. 12, Ltr. Regarding Request for Reasonable Accommodation (May 11, 2012),

22

ECF No. 22-2—her claimed retaliatory employment actions are understood to be related to her request to be exempted from the evening shift rotation, Compl. ¶¶ 37, 41, 46–49. Plaintiff, however, provides no evidence that she ever worked an evening shift or experienced adverse outcomes as a result of not working the shifts. *See* Pl.'s Resp. SMF ¶ 27 (alleging only that she was "repeatedly scheduled on the night shift"); Pl.'s Excerpted Hr'g Tr. (Degefu) at 33 ("Q: When you were transferred or reassigned to the evening shift in September 2014, how long did you actually work on that shift? A: I didn't."); EEOC Judgment at 8 (finding plaintiff never worked a single evening shift). Plaintiff's allegations that the Department failed to timely accommodate her request to work only the day shift thus do not rise to the level of a materially adverse action. *See Baloch*, 550 F.3d at 1199 (holding that suspensions proposed but never enacted failed this standard).

Plaintiff has identified sufficient evidence, however, to support a conclusion that her transfer to the Primary Care Clinic would dissuade a reasonable worker from making a charge of discrimination, and as a result, satisfied this materiality prong. Plaintiff's circumstances can be analogized to those of the employee in *White*, who was reassigned from her usual task of forklift duty to standard "track laborer" duties soon after a supervisor she reported for gender-based harassment was disciplined. *See White*, 548 U.S. at 57–58. The employee's new tasks fell within her original job description, but because her prior forklift duties were less arduous and considered "a better job," a "reasonable person in the plaintiff's position, considering 'all the circumstances,'" could determine that the reassignment was materially adverse. *Id.* at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Similarly, here, a reasonable person could conclude that plaintiff's involuntary transfer was materially adverse. To be sure, no evidence in the record suggests that the Primary Care Clinic was an objectively worse

job, but plaintiff argues that when management transferred her, rather than the supervisor she reported for harassing her, she was "victimiz[ed] twice," and effectively punished for speaking out. *See* Pl.'s Opp'n at 9. This may be a thin basis for a retaliation claim, but a reasonable employee might well be dissuaded from filing an administrative complaint if she thought her employer would retaliate by transferring her to a new position that she neither requested nor agreed to. *See Savage v. Azar*, 301 F. Supp. 3d 114, 130 (D.D.C. 2018) (finding genuine issue of material fact as to whether employee's reassignment, to another, equivalently compensated position, over her protests, constituted materially adverse action in retaliation context).

## 2.   *Discriminatory Cause*

Defendants contend that they are entitled to summary judgment because plaintiff has failed to demonstrate any "causality" between plaintiff's protected activity and the alleged adverse actions. Defs.' Mem. at 23. With regard to plaintiff's transfer to the Primary Care Clinic, defendants argue that the true reason for the change was plaintiff's poor working relationships with her colleagues, including but not limited to Adisu. Defs.' Reply at 12–13. Indeed, the record provides evidence to support this reason for plaintiff's transfer. Plaintiff retorts that this justification is mere "pretext," and that a reasonable jury could readily find that her transfer was retaliatory. Pl.'s Op'n at 23.

At summary judgment, courts focus on "one central question" in determining whether the causation prong of a retaliation claim is made out: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee . . . ?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Nunnally v.*

*District of Columbia*, 243 F. Supp. 3d 55, 66 (D.D.C. 2017) (applying the same question in the context of a retaliation claim, as here).

Plaintiff, as the non-movant, need not prove causation at summary judgment.  Rather, to survive defendant's motion, she need only show that "a reasonable jury could infer discrimination or retaliation from 'all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [any] other evidence.'"  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (alteration in original) (quoting *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010)); *see also Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D. C. Cir. 2009).  While "evidence of pretext is not *per se* sufficient to permit an inference of discrimination [or retaliation], it '[u]sually ... will be enough to get a plaintiff's claims to a jury.'"  *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (second alteration and omission in original) (first citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc); and then quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

Here, plaintiff has provided sufficient evidence, highlighting genuine issues of material fact, to draw a connection between her protected activity—reporting Adisu to Moore—and her transfer to a new position.  In her testimony at the administrative hearing, plaintiff recounted that her supervisors responded to her reports of continued harassment by Adisu by informing her sometime in September 2012 that "[t]hey told [Adisu] to stop and he [wouldn't] listen," and as a result, they decided to transfer plaintiff.  Pl.'s Excerpted Hr'g Tr. (Degefu) at 16.  Plaintiff's retaliation claim presents genuine issues of material fact not fit for resolution at summary judgment; summary judgment with respect to this claims is therefore denied.

**IV.     CONCLUSION**

Plaintiff has raised genuine issues of material fact that preclude summary judgment to defendant as to her claims of discrimination (Count I), hostile work environment (Count II), failure to accommodate (Count III), and retaliation (Count IV).  Accordingly, defendants' Motion for Summary Judgment is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 30, 2023

_____
BERYL A. HOWELL
 U.S. District Judge